UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **KEENE, INC.** <br> 2926 Chester Ave. <br> Cleveland, Ohio 44114 <br><br> and <br><br> **KEENE BUILDING PRODUCTS CO.**, <br> 2926 Chester Ave. <br> Cleveland, Ohio 44114 <br><br>     Plaintiffs, <br><br> v. <br><br> **UNITED STATES GYPSUM CO.**, <br> a Delaware corporation, <br> 550 West Adams Street <br> Chicago, Illinois 60661 <br><br>     Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. <br><br> JUDGE: <br><br> **JURY TRIAL DEMANDED** |

**KEENE, INC. AND KEENE BUILDING PRODUCTS, INC.'S COMPLAINT**

Plaintiffs Keene, Inc., f/k/a Keene Family Holdings Corp., ("Keene") and Keene Building Products Co. ("Keene Building Products"), by their attorneys, for their Complaint against Defendant United States Gypsum Co., states as follows:

**NATURE OF THE CASE**

1. This case is brought by Keene and Keene Building Products, affiliated family-owned companies, based in Cleveland, Ohio, against United States Gypsum Co. ("USG"), a self-proclaimed "leader in manufacturing . . . building materials" and one of the largest companies in the supply of gypsum underlayment and sound-attenuation materials. USG competes directly against Keene and its affiliated companies in the gypsum-cement underlayment and noise-control construction products markets. According to USG, it has "processes in place to . . . financially

outperform [its] competitors"; apparently, those processes include targeting its smaller competitors to interfere with their customer relationships and to unfairly compete.

2. In particular, this case is brought because USG engaged in a scheme during the height of the COVID-19 pandemic, from 2020 through 2021, to prevent Keene and Keene Building Products from selling the top-performing Quiet Qurl® noise control mat to both existing customers who had repeatedly and regularly purchased the product and to prospective customers who were ready and willing to purchase it.

3. At the time, USG knew that Keene Building Products' Quiet Qurl® noise-control mat was almost always sold in conjunction with GSL® K2.6—a product that was exclusively supplied by another Keene-owned company, Dependable, LLC. USG further knew that the Quiet Qurl® product was highly profitable for Keene Building Products and that certain installers would only use Quiet Qurl® when it was paired with GSL® K2.6.

4. Knowing this aspect of the market, USG undertook a scheme to target Keene and its affiliated companies, including both Dependable and Keene Building Products, by fraudulently inducing Dependable into a sham private-label agreement under which USG claimed it would manufacture GSL® K2.6 for Dependable. But USG never intended to manufacture GSL® K2.6 for Dependable or to fulfill its promises. Instead, it created its own inferior and unacceptable facsimile product and passed it off to Dependable as GSL® K2.6. USG compounded the impact of its anticompetitive scheme by undersupplying Dependable, providing defective product to Dependable and Dependable's customers, misdirecting shipments away from the proper customers, and refusing to provide necessary assistance when problems with USG's inferior and defectively manufactured product were uncovered.

5. As a result of USG's actions aimed at Keene and its affiliated companies, Dependable and Keene Building Products, USG knew that it would be able to cause Keene Building Products to lose Quiet Qurl® sales. In fact, Keene Building Products did lose those sales. Keene and Keene Building Products bring this suit against USG because of those losses that resulted directly from USG's conduct.[1]

## PARTIES

6. Plaintiff Keene, Inc. is an Ohio corporation organized under the laws of the State of Ohio. Keene, Inc. is the owner of Dependable, LLC, a separate company that is not a party to this case, but was also the victim of Defendant's wrongful conduct.

7. Plaintiff Keene Building Products Co. is an Ohio corporation organized under the laws of the State of Ohio. Keene Building Products Co. is owned by Keene. (Keene, Keene Building Products, and Dependable are collectively referred to as "the Keene Companies").

8. United States Gypsum Co. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Chicago, Illinois, and with manufacturing facilities in Gypsum, Ohio, and Westlake, Ohio.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

---

[1] USG's fraudulent conduct and other illegal actions directed against Dependable are presently the subject of pending litigation before the Northern District of Illinois captioned, *United States Gypsum Co. v. Dependable, Inc.*, Case No. 22-cv-268. In that case, USG initially brought suit against Dependable because USG alleges Dependable did not pay USG for GSL® K2.6, regardless of how unsatisfactory that USG-supplied product was. Dependable has counterclaimed for the damages USG caused through its fraudulent and anti-competitive conduct.

10. Personal jurisdiction exists over USG because, among other things, it purposely availed itself of the laws of this jurisdiction by engaging in business with Keene's Ohio-based affiliated company, Dependable, and by directing tortious conduct toward the Keene Companies, including Keene and Keene Building Products, which both operate in Ohio. Moreover, USG has ongoing business operations located in Ohio and Keene and Keene Building Products' claims arise out of or relate to USG's contacts with Ohio. USG's acts, and the consequences of those felt by Keene and Keene Building Products, have a connection with Ohio such that the exercise of jurisdiction over USG is reasonable and comports with traditional notions of fair play and substantial justice.

## FACTS

**A.  The Parties and Their Businesses**

11. Keene Building Products is an Ohio-based manufacturer of, among other things, noise-control products.

12. Since 2002, Keene has acquired companies with proven experience that began in the 1910's, 1950's and 2000's to offer products for floor preparation, below grade systems, and roofing. Keene and its affiliated companies focus on providing the newest technologies and meeting customers' demands. One of the products Keene Building Products makes and sells is Quiet Qurl®, which is a sound-control mat designed to limit the impact of noise between floors of multi-story buildings. Quiet Qurl® is a registered trademark, owned by Keene Building Products.

13. Quiet Qurl® is not the only product used in the construction of multi-story buildings and Keene and its affiliated companies make a number of different products used in constructing such buildings. For example, the Keene-affiliated company Dependable sells a gypsum-cement underlayment called GSL® K2.6, which (like USG's Levelrock®) is a form of cement that is sold as a dry mixture, made with gypsum and that, when mixed with water, hardens into a flooring

4

Case: 1:24-cv-01877 Doc #: 1 Filed: 10/28/24 5 of 16. PageID #: 5

surface. Quiet Qurl® and GSL® K2.6 are typically applied on top of concrete slabs to, among other things, create a smooth surface that improves the strength of the flooring and contributes to soundproofing and fire safety.

14. As it pertains to sound-control products like Quiet Qurl®, the Quiet Qurl® mat is designed to absorb sound when it is sandwiched in a mass-spring-mass design where the Quiet Qurl® represents the spring, the bottom "mass" is the underflooring, and the top "mass" is GSL® K2.6.

15. Builders often use Quiet Qurl® in conjunction with GSL® K2.6 to cover and encapsulate the mat to create the appropriate noise-control system. Noise-control mats and gypsum-cement underlayment are generally sold to customers as a single package or "system." As such, in the vast majority of installations in which Keen Building Products' Quiet Qurl® is used, Quiet Qurl® is sold in conjunction with Dependable's GSL® K2.6. The sales of the two products are so consistently linked that the unavailability of Dependable's GSL® K2.6 leads directly to Keene Building Products losing sales of Quiet Qurl® sound-control mat.

16. Importantly, USG is very aware of this relationship. In fact, at one point when the Keene Companies approached USG, seeking USG's cooperation in adding Keene Building Products' Quiet Qurl® to an Underwriters' Laboratory design specification that allowed for the use of USG's competing Levelrock® products, USG denied the request and refused to cooperate.

17. Keene Building Products owns trademark registration number 7854119 for Quiet Qurl®, which is a registered trademark for soundproofing materials for building, namely, patterned plastic core and associated water-impermeable membrane for floor, wall, and ceiling assemblies and building construction. The trademark was first used in commerce on November 1, 2002 and the trademark registration was published on March 28, 2006.

5

18. Dependable, a company also owned by Keene, sells the GSL® K2.6 product. Dependable owns USPTO registration number 2,197,517 for GSL® as a trademark for cementatious underlayment compound for use in construction and building repair. The trademark was first used in commerce on March 7, 1997 and the trademark registration was published on April 28, 1998.

19. USG is also, and at all relevant times has been, a seller, supplier and/or manufacturer of noise-control mats and gypsum-cement underlayment. It competes directly with Keene, Keene Building Products, and Dependable in those markets. In fact, USG is one of the most significant players in the gypsum-cement underlayment and noise-control sound mat markets. USG's sound attenuation and gypsum-cement underlayment products, which compete with Keene Building Products' Quiet Qurl® and Dependable's GSL® K2.6, are sold under USG's Levelrock® brand.

**B.  USG Targeted the Keene Companies with a Fraudulently Induced Private-Label Manufacturing Agreement to Manufacture Dependable's GSL® K2.6.**

20. In the United States, while others may sell competitive brands and unique formulations, gypsum-cement underlayment products are nearly all manufactured by only three companies: USG, Georgia-Pacific, and Arcosa. Based on available information and industry experience, the Keene Companies believe that USG has an approximately 45% market share, Georgia-Pacific also has an approximately 45% market share, and Arcosa has the remaining market share.

21. Dependable has been building a market share but, as discussed herein, Dependable was working with USG to manufacture its private-label product and now either makes GSL® K2.6 by itself or works with another, different supplier.

6

22. Because of the relatively few market players in the gypsum-cement underlayment market, it is nearly impossible to keep the original manufacturer a secret. Industry professionals know and understand that USG manufactures gypsum mainly in Southard, Oklahoma, and also in Fort Dodge, Iowa.

23. For certain of the Keene companies, like Dependable, the companies often work with other manufacturers to meet customers' demand and do so by contracting with another company to manufacture a product to its specifications using Dependable's proprietary formulation, or recipe, such that Keene or its affiliate will then be able to sell the product under its own brand name based on its expectation that the product is consistent with the quality established by the proven mixture specified and works consistent with the Keene Companies' expectations and experience.

24. USG had provided gypsum material to a predecessor entity to Dependable in the period before 2013. At that time, USG merely provided "base" gypsum that Dependable used as an ingredient for its own formulation. However, as Dependable expanded its product lines and began to enter into business lines more directly competitive with USG's products, USG ceased selling material to Dependable for a time.

25. At some point during 2019, Dependable discussed with USG whether it would be possible for USG to produce private-label gypsum-cement underlayment products for Dependable. Those discussions concluded when USG informed Dependable that USG "did not have capacity" to manufacture such products for Dependable.

26. In early 2020, Jim Keene, the head of the Keene Companies (including Dependable), re-visited the issue with Joe Adcock of USG, and the two discussed the prospect of USG manufacturing gypsum-cement underlayment products for Dependable. Dependable

specifically requested that USG produce Dependable's GSL® K2.6 product, using Dependable's formulation, and in a volume agreeable to the parties.

27. Mr. Adcock repeatedly stated to Mr. Keene that USG had sufficient capacity to meet Dependable's volume requirements. Mr. Adcock expressly represented to Mr. Keene that USG would produce the GSL® K2.6 product pursuant to Dependable's proprietary formulation and as specified by Dependable. Mr. Adcock also expressly represented that USG had the capability of producing a product that would be of the quality and performance commensurate with Dependable's specifications—*i.e.,* that USG's manufacture of Dependable's GSL® K2.6 product would have the pourability, healing characteristics, and set-times specified for GSL® K2.6's intended use.

28. Based on its understanding of USG's manufacturing process, Dependable understood and believed that production of GSL® K2.6 using Dependable's proprietary formulation would require USG to change over its production lines and re-configure its machines to work with Dependable's formulation and, thus, Dependable understood that USG was charging a higher price for production of GSL® K2.6 as opposed to simply selling to Dependable USG's own Levelrock® gypsum-cement underlayment product.

29. Dependable has since learned that Mr. Adcock's express representations, which Dependable relied upon in entering into a "Private Label Agreement" or "PLA" were false and, that: (a) USG knew that it did not have the capacity to meet the demands specified in the PLA, (b) USG was not going to produce the GSL® K2.6 according to Dependable's formulation, expectations, or specifications; and (c) USG's production process was not capable of manufacturing both USG's own product and Dependable's GSL® K2.6 in a manner that would

8

produce GSL® K2.6 with the pourability, healing characteristics, and set times specified for the product.

30. Dependable learned much later that none of Mr. Adcock's statements about what USG could do or what it could provide were true and that USG was simply making these statements to induce Dependable into an arrangement where USG could both sell more of its own product and limit and control its competitor's ability to meet growing demand for Dependable's GSL® K2.6 product and, in turn, Keene Building Products' Quiet Qurl® product.

31. In fact, based on information available to it, Keene believes that USG was gambling on the fact that Dependable would not order the full volume of product specified in the PLA and that Dependable would never discover that USG was simply providing Dependable an inferior-quality formulation that was manufactured in a substandard fashion. Ultimately, the non-conforming gypsum-cement underlayment product that USG manufactured, ostensibly pursuant to the PLA, for Dependable was delivered to Dependable and sold by Dependable under the name "GSL® K2.6" based on Dependable's reliance on USG's representations that the product was manufactured pursuant to specification and free of manufacturing defects.

32. Throughout the course of Dependable and USG's business relationship, there were many issues with USG delivering product that conformed to Dependable's specifications and orders. Specifically, USG delivered product to Dependable that was: 1) damaged due to negligent packing; 2) delayed shipments due to, upon information and belief, USG's inability to manufacture the agreed-upon quantities of GSL® K2.6; and 3) provided product to Dependable that was

defective because it "set too quickly,"[2] and had "pock marks."[3] Aside from quality issues identified above, USG also refused to cooperate in directing delivery of products to Dependable such that it sought to induce a breach and/or inflict commercial harm on Dependable.

33. Regardless, Dependable, pursuant to its obligations under the PLA worked to keep confidential the fact that USG was manufacturing GSL® K2.6 under the PLA. Nonetheless, USG began representing to Dependable that it had claims against it pursuant to the Lanham Act based on USG's representation that Dependable had informed potential customers that USG was putting USG's Levelrock® product in a Dependable bag that Dependable was selling as GSL® K2.6.

34. At the time of this accusation, Dependable had not made this statement to a customer, and so informed USG. This is because, at the time, Dependable did not know what it now understands to be the case—that USG was actually ignoring its promise to manufacture GSL® K2.6 according to Dependable's formulation and specifications and, instead, USG was falsely representing to Dependable and its customers that the product USG was making was Dependable's GSL® K2.6.

---

[2] When made to specifications and mixed with water, GSL® K2.6 will only harden, *i.e.* "set," after a specified time. The delay in setting is necessary so that the GSL® K2.6-water mixture can be poured through a concrete pump hose and spread out to ensure there is an even layering of GSL® K2.6 throughout the area where it is being poured. When the product sets too quickly and hardens in the machinery, it causes costly and unworkable damage to a customer's equipment such that the customer must focus on a time-consuming process of getting solidified cement out of hoses and pumps, which may require jack-hammering the cement to loosen it and remove it. The set-time was, in fact, part of the specification pursuant to the terms of the PLA. Yet, multiple Dependable customers reported to Dependable that the USG-produced GSL® K2.6 on their job sites was setting too quickly and some customers even experienced "flash setting" where the GSL® K2.6 set so quickly that it hardened inside a concrete hopper and multiple pump hoses before it could even be poured.

[3] "Pock marks" are holes in the surface of the material and colored streaking in the surface of the material. These are problems because hardened GSL® K2.6 should set smoothly and in one uniform color.

35. In fact, the very idea of Dependable ever representing to anyone that USG was putting Levelrock® in Dependable's GSL® K2.6 packaging was completely contrary to Dependable's intention for this relationship. It was material and important to Dependable that it receive from USG, GSL® K2.6 made consistent with Dependable's proprietary formulation, which Dependable believed was a more expensive, higher-quality product and which USG was charging Dependable a higher price to manufacture. Importantly, it was also the formulation with performance characteristics that Dependable understood and that it could support its customers in applying.

36. At the time that USG made accusations of Lanham Act violations, it had also purposefully delayed shipment of material for outstanding orders (ostensibly as a result of USG's claimed concern regarding the alleged Lanham Act violation), and Dependable had customer orders that it needed to fill immediately. Many of those orders were linked to accompanying orders of Keene Building Products' Quiet Qurl®. Without the necessary GSL® K2.6 from USG (and without an adequate replacement supplier), Keene Building Products and Dependable no longer had the ability to service their customers' needs for both Quiet Qurl® and GSL® K2.6.

37. Those customers would then turn to another supplier, and, in the noise-control mat and gypsum-cement underlayment markets, that supplier would likely be USG or Georgia-Pacific, if necessary, working with their chosen collaborating suppliers like USG's one-time sound-mat supplier Advanced Building Products, but not with the Keene Companies. . Thus, USG's delay in shipping ordered product significantly impacted the Keene Companies' and, particularly, Keene Building Products' business in the market. At the time that this was occurring, it could have wiped out the Keene Companies' ability to compete in the market.

11

38. Therefore, with customer needs outpacing supply, Dependable had no choice but to agree to the terms of a "Settlement Agreement" that ostensibly released Dependable from Lanham Act violation claims that never existed. Dependable was forced to acquiesce to USG's baseless demands so that shipments of GSL® K2.6 would resume.

39. Further, despite the fact that the PLA made the parties' arrangement confidential, USG completely failed to maintain confidentiality. Instead, USG shipped pallets of GSL® K2.6 in a plastic wrapping that bore USG's logo. USG included its logo on that wrap knowing that the product would normally be delivered in palletized form to Keene's customers and, thus, to disclose to customers USG's involvement. Moreover, the bags of GSL® K2.6 included information showing that the product was manufactured in Southard, Oklahoma. It was, and is, common knowledge in the industry that there is only one facility in Southard, Oklahoma that makes gypsum products and that said facility is owned and operated by USG.

40. USG's overall conduct was aimed at limiting the Keene Companies' ability to cover their customers' demand and to drive those customers to shift from purchasing Keene's product like Quiet Qurl® and GSL® K2.6 in favor of Levelrock® and related products from USG.

41. Throughout the course of its relationship with USG, Dependable performed its contractual obligations to USG and did not breach any agreement. Despite the fact that Dependable had performed according to the PLA and USG had refused to work with Dependable to address issues, USG filed a complaint against Dependable on January 21, 2022, *United States Gypsum Co. v. Dependable, LLC*, Case No. 22-cv-00268, in the United States District Court for the Northern District of Illinois, claiming that Dependable breached an agreement between the parties.

C.  **USG's Actions Affecting the Keene Companies**

42. As stated above, USG is a major player in both the sound attenuation mat and gypsum-cement underlayment markets. As such, it knows, and knew well before the PLA was signed, that noise-control mats and gypsum-cement underlayment are generally sold to customers as a single package or "system." On information and belief, USG knew before the PLA was signed that Keene's Quiet Qurl® and Dependable's GSL® K2.6 are sold as a system, and that this system is competitive with USG's Levelrock® system.

43. All of USG's tortious and fraudulent acts described above and in Exhibit A did not just harm Dependable—they harmed the Keene Companies in their effort to sell Quiet Qurl®. Before USG's misconduct began, Keene had customers that would buy Quiet Qurl® from Keene when buying GSL® K2.6 from Dependable.

44. Specifically, there were six customers who the Keene Companies sold both Quiet Qurl® and GSL® K2.6 on a regular basis, (the "Affected Customers"). In 2018 and 2019, before Dependable and USG entered the PLA, Keene sold the Affected Customers millions-of-dollars-worth of Quiet Qurl®.

45. In 2020, 2021, 2022, and 2023, Keene lost 35% of its sales volume to the Affected Customers in large part because, as a result of USG's intentional acts, the Keene Companies could not supply customers with GSL® K2.6 to accompany their purchases of Quiet Qurl®.

46. To make matters worse, some of the Affected Customers completely stopped buying any products from the Keene Companies in 2023 and 2024 as a direct result of USG's anti-competitive and fraudulent conduct. Now, the Keene Companies have completely lost their business from those customers who had routinely bought from the Keene Companies for years before USG's conduct drove them away.

13

47. Through the same conduct USG directed against Dependable, USG intended to and did, in fact, harm Keene Building Products' sales of Quiet Qurl® in an effort to gain a competitive advantage in the noise-control-mat market, much in the same way USG intended to harm Dependable's sales of GSL® K2.6 to gain a competitive advantage in the gypsum-cement underlayment market.

**COUNT I**
**Intentional Interference with Prospective Business Relationships**

48. Keene and Keene Building Products hereby incorporate the allegations in the preceding paragraphs as if set forth fully herein.

49. Keene and Keene Building Products, had business relationships with customers, including the Affected Customers, who routinely, over a course of years, purchased from the Keene Companies, on a regular basis, convoyed orders of GSL® K2.6 and Quiet Qurl® as a system to be installed together.

50. USG was aware that the Keene and Keene Building Products had business relationships with the Affected Customers, and other similar customers, through which the Keene Companies sold those customers both GSL® K2.6 and Quiet Qurl® as part of a system. Not only did USG have generalized industry knowledge about the Keene Companies' customers, but at certain points in time, USG was actually fulfilling orders of GSL® K2.6 and shipping material to job sites for those customers, revealing to USG the exact identity of those Keene customers.

51. USG intentionally interfered with Keene's and Keene Building Products' business relationships with these customers by knowingly and fraudulently inducing one of the Keene Companies, Dependable, into a business arrangement where USG would variously under-supply GSL® K2.6 that was necessary for installation of Quiet Qurl®, misdirect delivery of GSL® K2.6 away from work sites where the customer was expected to install Quiet Qurl® along with the GSL®

14

K2.6, and/or purposely supply Dependable with non-conforming and/or defective GSL® K2.6. As a result of the bad product provided by USG or the improperly and untimely delivered product, the Affected Customers began to refuse to continue buying products from Keene and Keene Building Products.

52. USG's intentional and fraudulent conduct directed at interfering with Keene's and Keene Building Products' customer relationships cannot be the subject of any applicable privilege.

53. Keene and Keene Building Products suffered damages as a result of USG's intentional interference with their customer relationships because those customers stopped or significantly reduced their order of Quiet Qurl® from Keene Building Products resulting in millions of dollar in lost sales for Keene Building Products.

WHEREFORE, Keene and Keene Building Products hereby request that they be awarded actual damages, their attorneys' fees and costs, pre-judgment and post-judgment interest, and such other and further relief to which they may be justly entitled as a result of USG's tortious interference.

## COUNT II
### Common Law Unfair Competition

54. Keene and Keene Building Products hereby incorporate the allegations in the preceding paragraphs as if set forth fully herein.

55. By reason of the acts and commercial practices set forth above, USG has been and is engaged in unfair competition against Keene and Keene Building Products under the common law of Ohio.

56. USG's acts of unfair competition have caused injury to Keene and to Keene Building Products in an amount to be determined at trial.

15

WHEREFORE, Keene and Keene Building Products hereby request equitable disgorgement of ill-gotten gains received by USG, and that Keene and Keene Building Products be awarded their attorneys' fees and costs, pre-judgment and post-judgment interest, and such other and further relief to which Keene and Keene Building Products may be justly entitled as a result of USG's unfair competition.

## JURY DEMAND

Keene and Keene Building Products demand a trial by jury.

Date: October 28, 2024

Respectfully submitted,

By: /s/ *Jonathan R. Secrest*
Jonathan R. Secrest (0075445)
Dickinson Wright PLLC
180 E. Broad Street, Suite 3400
Columbus, Ohio 43215
Telephone: 614.744.2570
jsecrest@dickinson-wright.com

Kristen E. Hudson (Ill. No. 6281191)
David S. Becker (Ill. No. 6271932)
Ethan A. Hastert (Ill. No. 6286353)
Elizabeth A. Patton (Ill. No. 6346252)
Dickinson Wright PLLC
55 W Monroe St., Suite 1200
Chicago, IL 60603
Telephone: 312.641.0060
khudson@dickinson-wright.com
dbecker@dickinson-wright.com
ehastert@dickinson-wright.com
epatton@dickinson-wright.com
(*Applications for Admission Pro Hac Vice Forthcoming*)

*Counsel for Plaintiffs Keene, Inc., and Keene Building Products, Inc.*